**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
200 West 41st St., 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Maeghan J. McLoughlin

*Proposed Counsel to the Debtor and Debtor in*
  *Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re                                                      :        Chapter 11
                                                           :
HOT SHOT HK, LLC,                                          :        Case No. 16-10449 (JLG)
                                                           :
                                                           :
                           Debtor.                         :
-----------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION**
**FINANCING AND TO GRANT SUPERPRIORITY LIENS AND CLAIMS PURSUANT**
**TO 11 U.S.C. § 364(c) AND (d); (II) AUTHORIZING THE DEBTOR TO UTILIZE CASH**
**COLLATERAL AND GRANT ADEQUATE PROTECTION TO PREPETITION**
**SECURED LENDER; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING**
**RELATED RELIEF**

TO THE HONORABLE JAMES L. GARRITY,
UNITED STATES BANKRUPTCY JUDGE:

        Hot Shot HK, LLC (the "Debtor"), the Debtor in the above-referenced bankruptcy case,

by its proposed counsel Klestadt Winters Jureller Southard & Stevens, LLP hereby files this

motion (the "Motion") seeking entry of an interim order, substantially in the form attached

hereto as Exhibit A (the "Interim Order"), and a final order (the "Final Order," together with the

Interim Order, the "DIP Borrowing Orders") (a) authorizing the Debtor to obtain post-petition

financing (the "DIP Facility") from HS HK Acquisition, LLC (the "DIP Lender") pursuant to the

terms of a certain debtor in possession lending agreement (the "DIP Agreement") and use Cash

1

Collateral (as defined herein) of JPMorgan Chase Bank, N.A. ("Prepetition Lender") pursuant to

sections 361 and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code"); (b) approving the form of adequate protection provided to Prepetition Lender pursuant

to Bankruptcy Code sections 361 and 363; (c) scheduling a final hearing ("Final Hearing") on

the Motion; and (d) granting related relief. In support of this Motion, the Debtor respectfully

represents as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105, 361, 362,

363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 9014, and Rule 4001-2

of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## INTRODUCTION

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11 of Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of New York.

5.      The Debtor continues to operate its business and manage its respective properties

as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  No

trustee or examiner has been appointed in the Bankruptcy Case.  As of the date of this Motion,

the United States Trustee has not yet appointed an official committee of unsecured creditors in

the Bankruptcy Case.

6.      The Court and interested parties are respectfully referred to the Declaration of

Youssef Saadia Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions,

dated February 26, 2016 (the "Saadia Declaration") for a background on the Debtor, its

operation, and the events leading to the filing of the Bankruptcy Case.

7.      The Debtor intends to file a motion seeking, among other things, an order

authorizing the sale of substantially all of the Debtor's assets free and clear of liens, claims, and

encumbrances (the "Sale Motion").  By the Sale Motion the Debtor intends to sell substantially

all of its assets (the "Sale Transaction") to the DIP Lender.

### DEBTOR'S EXISTING SECURED INDEBTEDNESS

8.      Prior to the Petition Date, pursuant to the terms, conditions and limitations set

forth in the documents identified below, Prepetition Lender extended to the Debtor a credit

facility consisting of a $4,000,000.00 line of credit (the "Prepetition Obligations").  As of the

Petition Date, the Prepetition Lender asserted that the Debtor owed a balance of $2,961,384.65

on account of the Prepetition Obligations.

9.      The Prepetition Obligations are evidenced by certain documents including: (i) a

certain Promissory Note in the original principal amount of $4,000,000 (the "Note") delivered to

the Prepetition Lender by the Debtor dated as of November 19, 2014; (ii) a certain Commercial

Security Agreement (the "Security Agreement"), dated November 19, 2014, between the Debtor

and Prepetition Lender granting Prepetition Lender a limited security interest (the "Prepetition

Lien") in all inventory, chattel paper, accounts, equipment, and general intangibles, whether now

owned or hereafter acquired; (iii) a certain continuing commercial guaranty of Marko Elenhorn

(the "Elenhorn Guaranty"); and (iv) a certain continuing commercial guaranty of Joseph Saadia

(the "Saadia Guaranty") (collectively, as amended, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Loan Documents").

10.     A lien search conducted in the State of New York revealed that the Lender filed a UCC-1 financing statement (the "UCC Statement") which purports to cover as collateral under the Note and Security Agreement all inventory, chattel paper, accounts, equipment and general intangibles, in each case whether then or thereafter existing or then owned or thereafter acquired, all accessions, additions, replacements, and substitutions, and all records of any kind relating to any of the foregoing, all proceeds relating to any of the foregoing, including insurance, general intangibles, and other accounts proceeds (the "Prepetition Collateral").

11.     In addition, Novelty Textile Inc. ("Novelty") holds a judgment (the "Judgment") against the Debtor arising out of a lawsuit between the parties.  The Debtor maintains that Novelty does not possess a right or interest in the Debtor's cash on account of the Judgment, and therefore, Novelty is not entitled to adequate protection.

12.     The Debtor believes that all cash, accounts receivable, and other proceeds of the Prepetition Collateral in the Debtor's possession or control as of the Petition Date, and all cash, accounts receivable and other proceeds of the Prepetition Lender's Collateral coming into the Debtor's possession or control after the Petition Date, constitute the Prepetition Lender's cash collateral (the "Cash Collateral") within the meaning of section 363(a) of the Bankruptcy Code. The Debtor proposes to provide adequate protection to the Prepetition Lender upon the terms set forth herein.

## RELIEF REQUESTED

13.     By this Motion, the Debtor requests entry of the Interim Order, substantially in the form attached hereto as Exhibit A, and a final order to be submitted to the Court for approval

prior to the Final Hearing, (a) authorizing the Debtor to enter into a senior secured DIP Facility with the DIP Lender in an aggregate principal amount of up to $400,000, for which the Debtor seeks immediate access in an amount of up to $150,000 on an interim basis; (b) authorizing the Debtor to use Cash Collateral on an interim basis; (c) granting certain adequate protection, including to the Prepetition Lender in connection with the use of Cash Collateral and any diminution in the value of the interests of the Lender in its Prepetition Collateral; and (d) approving the form and manner of notice and scheduling the Final Hearing.  The primary purpose of the DIP Facility will be to fund payroll and other operating expenses, as well as fund transaction costs, through the anticipated closing of the Sale Transaction.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

14.    Pursuant to, and in accordance with, Bankruptcy Rule 4001(b) and the *Guidelines for Financing Motions* and *Guidelines for First Day Motions* set forth in Administrative Orders Nos. 558 and 565 of the United States Bankruptcy Court for the Southern District of New York (collectively, the "Guidelines"), the following is a concise statement of the material provisions of the Interim Order and the terms of the DIP Agreement, a copy of which is annexed hereto as Exhibit B:

| Borrower | Hot Shot HK, LLC |
|---|---|
| DIP Lender | HS HK Acquisition LLC |
| Relationship between DIP Lender and Borrower | The Debtor is owned by Joseph Saadia, Marko Elenhorn, and Youssef Saadia.  Purchaser is owned by Joseph Saadia, Youssef Saadia, Marko Elenhorn, and Victor Lalo. |
| Post-Petition Financing Limit | Up to $400,000 |
| Use of Proceeds | The DIP Facility will be used by the Debtor to provide liquidity in operation of the business until closing of the Sale Transaction and pay the costs and expenses necessary to conclude the Sale Transaction in accordance with the Budget. |
| Interest Rate | The DIP Loan shall bear interest at a rate equal to the prevailing prime rate as published by the Wall Street Journal, plus 1%. |

| Closing Date | As soon as practicable after entry into the DIP Loan. |
|---|---|
| Funding Date | The Debtor shall be funded with the DIP Facility after entry of the Interim Order. |
| Events of Default | (a)   The Debtor shall fail to pay any principal or interest of the DIP Loan or any other DIP Obligations[1] (including any fees or reimbursable amounts) when any such amount becomes due in accordance with the terms hereof, which failure continues for a period of five (5) Business Days after notice thereof from DIP Lender; or

(b)   The Debtor, shall default in the observance or performance of any covenant, agreement, obligation or restriction set forth in this Agreement any other DIP Loan Document, and such Default shall continue for a period of ten (10) Business Days after notice thereof from DIP Lender; or

(c)   The Court shall enter an order with respect to the Debtor dismissing the Chapter 11 Case or converting it to a case under chapter 7 of the Bankruptcy Code, or, without the prior written consent of DIP Lender (i) appointing a trustee in its Chapter 11 Case or (ii) appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtor's business (beyond those set forth in Section 1106(a)(3) or (4)) under Bankruptcy Code Section 1106(b); or

(d)   The DIP Debtor shall fail to comply with the terms of the Interim DIP Order or the Final DIP Order, if any; or

(e)    There occurs any Material Adverse Change, including without limitation, any impairment to the value of Collateral which Lender in good faith deems will threaten timely payment in full of the DIP Loan; or

(f)   The Court grants any superpriority administrative expense claim or Lien or enters any order granting relief from the automatic stay (if not in favor of Lender) on any assets of the Debtor which have an aggregate value in excess of $50,000, except with the express written consent of DIP Lender; or

(g)   The Debtor shall assume or reject any lease of an interest in the Property without the prior written consent of the DIP Lender. |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the DIP Agreement.

| | |
|---|---|
| **Borrowing Conditions** | Entry of a Final DIP Order that is satisfactory to Lender. |
| **Securities and Priorities** | Subject to the Carve Out (as defined below), the DIP Lender will receive a valid and perfected first-priority lien on all now owned and hereafter acquired Collateral (as defined in the DIP Loan Agreement), in all of the Debtor's assets, including, without limitation, accessions, accounts receivable, books and records, chattel paper, commercial tort claims, consignments, contract rights, deposit accounts, equipment, general intangibles, goods, instruments, inventory and all other assets and the proceeds and products of all of the foregoing (the "<u>Collateral</u>"), except the Collateral shall not include avoidance and similar actions and claims of the Debtor arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code and any proceeds thereof (the "<u>Chapter 5 Claims</u>"). <br><br> As used in this Interim Order, the "Carve Out" means the following expenses: (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. Section 1930(a)(6); (b) expenses incurred by any Chapter 7 trustee in connection with the wind-down of the Debtor's estate not to exceed \$15,000 (the "<u>Chapter 7 Expenses</u>"); and (c) subject to the terms and conditions of this Interim Order, allowed and unpaid professional fees and disbursements incurred by professionals for the Debtor and any Statutory Committee, if any (such professional, a "<u>Case Professional</u>"), in the aggregate amount of up to \$50,000 and to the extent allowed or later allowed by order of the Court (which order has not been reversed, vacated or stayed, unless such stay has been vacated) under sections 328, 330 and/or 331 of the Bankruptcy Code (this portion of the Carve-Out referred to as the "<u>Case Professionals Carve Out</u>") |
| **Superpriority Claims** | Subject to the Carve Out, pursuant to section 364(c) of the Bankruptcy Code and the DIP Borrowing Orders, all obligations of the Debtor under the DIP Agreement at all times shall constitute allowed super-priority administrative expense claims in the Bankruptcy Case having priority over all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code, subject only to the Carve-Out. |
| **Reimbursement of Lender's Professionals** | The Debtor is not responsible for payment of the actual fees and expenses of the DIP Lender's professionals. |
| **Adequate Protection** | Debtor will make monthly interest payments and provide replacement liens in new accounts receivable to Prepetition Lender. Subject to entry of a Final Order, Prepetition Lender shall also receive a lien on Chapter 5 Claims as a form of |

7

| | |
|---|---|
| | additional adequate protection. |
| **Sale Milestones** | It shall be an Event of Default under the Final Order, if any, if the Debtor shall fail to secure the entry of an Order of the Bankruptcy Court: |
| | (i)    approving the Asset Purchase Agreement and related bid procedures on or before March 15, 2016; and |
| | (ii)   approving a sale transaction for sale of substantially all assets of the Debtor on or before April 15, 2016. |

### <u>COMPLIANCE WITH RULE 4001-2 OF THE LOCAL RULES</u>

15.     Rule 4001-2 of the Local Rules requires that certain provisions contained in the financing documents and/or Interim Order be highlighted, and that the Debtor must provide justification for the inclusion of such highlighted provision(s).  The Debtor believes that certain provisions of the DIP Loan implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of this bankruptcy case.  Accordingly, the Debtor has set forth each of the sub-sections of Rule 4001-2 of the Local Rules and have detailed whether or not the DIP Documents, this Motion and/or the DIP Orders contain or contemplate provisions which would fall within the ambit thereof:

Local Rule 4001-2(a)(1):  This Motion and the proposed DIP Orders sets forth the amount of credit the Debtor seeks to obtain, including any committed amount under the DIP Agreement.

Local Rule 4001-2(a)(2):  This Motion describes all material conditions to closing and borrowing, including budget provisions.

Local Rule 4001-2(a)(3):  This Motion describes all material pricing and economic terms, including letter of credit fees, commitment fees, any other fees, and the treatment of costs and expenses of the lender, any agent for the lender, and their respective professionals, in each case to the extent applicable.

Local Rule 4001-2(a)(4):  The Motion describes the effects on existing liens of the granting of collateral or adequate protection provided to the lender and any priority or superpriority provisions.

Local Rule 4001-2(a)(5): This Motion describes any applicable carve-outs from liens or superpriorities;

Local Rule 4001-2(a)(6):   The DIP Agreement and DIP Borrowing Orders do not contemplate any cross-collateralization provision that elevates prepetition debt to administrative expense (or higher) status or that secures prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

Local Rule 4001-2(a)(7): The DIP Agreement and DIP Borrowing Orders do not contemplate any roll-up provision which applies the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.

Local Rule 4001-2(a)(8): The DIP Agreement and DIP Borrowing Orders do not contemplate any provision that would limit the Court's power or discretion in a material way, or would interfere with the exercise of the fiduciary duties, or restrict the rights and powers, of the trustee, debtor in possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code, or any other fiduciary of the estate, in connection with the operation, financing, use or sale of the business or property of the estate, but excluding any agreement to repay postpetition financing in connection with a plan or to waive any right to incur liens that prime or are pari passu with liens granted under § 364 of the Bankruptcy Code.

Local Rule 4001-2(a)(9):   The Motion describes the implementation and restrictions on the Debtor with respect to the use of proceeds under DIP Agreement as reflected in the Budget.

Local Rule 4001-2(a)(10):   This Motion describes applicable events of default, any effect of termination or default on the automatic stay or the lender's ability to enforce remedies, any cross-default provision, and any events on which the availability of credit will cease.

Local Rule 4001-2(a)(11):   The DIP Agreement and DIP Borrowing Orders do not contemplate any change-of-control provisions.

Local Rule 4001-2(a)(12):  The Motion describes any applicable provision establishing a deadline for, or otherwise requiring, the sale of property of the estate.

Local Rule 4001-2(a)(13):  The DIP Agreement does not contemplate any provision that affects the Debtor's right or ability to repay the financing in full during the course of the chapter 11 reorganization case.

Local Rule 4001-2(a)(14):  As set forth in the Motion, the Debtor is a borrower under the DIP Agreement and DIP Borrowing Orders and is liable for the obligations under the DIP Agreement and DIP Borrowing Orders.

Local Rule 4001-2(a)(15):  This rule is not applicable.

Local Rule 4001-2(b):  The Motion describes the Debtor's efforts to obtain financing, the basis for the Debtor's belief that the DIP Agreement and DIP Borrowing Orders are on the best terms available, and the basis for why the Debtor believes the extension of credit is being made in good faith.

## AUTHORIZATION FOR POST-PETITION FINANCING

### A.  The Post-Petition Financing Should be Approved Pursuant to 11 U.S.C. § 364(c)

16.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b) or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

17.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  See In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo.

10

2003) ("the applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . .").

18.     Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility. For example, in In re ION Media Networks, Inc., the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

19.     The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).

20.     Courts have applied the following three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code: (i) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011); see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (noting that a court "may not approve any credit transaction under subsection (c)

unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)") (citations omitted); In re Farmland Indus., Inc., 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment"). As discussed below, each of these elements is satisfied.

**The Debtor is Unable to Obtain Unsecured Credit**

21.    Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); In re Gen. Growth Props., Inc., 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

22.    The Debtor requires access to working capital, beyond the small amount of cash available to it from current operations and assuming collections continue, in order to preserve and maintain the value of its business during the Bankruptcy Case. The Debtor is unable, in the present circumstances, to meet its liquidity needs by obtaining financing on an unsecured, administrative expense basis. Given the troubles generally facing teen and young adult retailers, as evidenced by the recent liquidations of customers such Deb Stores, dELiA*s,

12

Inc., and Body Central Corp., and the Wet Seal bankruptcy filing, combined with the Debtor's continued projected losses, the Debtor found that most of the potential third-party factors and asset based lenders or even equity investors were not interested in providing financing to the Debtor during the chapter 11 case. The Prepetition Lender was unwilling to provide further extensions of credit on any basis in connection with this chapter 11 case. The Debtor submits that no third party lender would be willing to provide financing on terms nearly as attractive as those offered by the DIP Lender.

23.     Indeed, the only party willing to provide financing for the continued operation of the Debtor's business and to fund the administration of a Bankruptcy Case so as to preserve value for creditors is the DIP Lender. The Debtor has been unable to secure credit on an unsecured basis that was adequate to meet these needs.

24.     In light of the Debtor's inability to obtain alternative post-petition financing proposals from other lenders through credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under sections 364(a) and 364(b) of the Bankruptcy Code, or credit secured by liens on the Debtor's assets junior to the Prepetition liens, as is contemplated by section 364(c)(3) of the Bankruptcy Code, the Debtor does not believe that any lender would be willing to loan new money to the Debtor other than on terms that are far less favorable than those contained in the DIP Agreement.

25.     In short, the Debtor determined that a consensual DIP Facility with the DIP Lender will save expense and time at the outset of this Bankruptcy Case, thereby allowing the Debtor to preserve value and focus on its sale efforts.

**The Transactions Under the DIP Agreemetn are Necessary to Preserve the Estate**

26.     The DIP Facility will be used by the Debtor to operate the business until closing

of the Sale Transaction and pay the costs and expenses necessary to conclude the Sale

Transaction in accordance with the Budget.

27.     Without access to post-petition financing, the Debtor will be unable to withstand

any meaningful adjustment to collections of revenue that it projects.  Without some working

capital support, operating the business as a going concern until closing of the Sale Transaction,

will be very challenging and will and jeopardize the Debtor's ability to sell its assets to the

detriment of all creditor constituencies.  The Debtor has very little cash and, as described above,

and limited liquidity that is dependent on reliable collection of receivables.  The DIP Facility will

provide support for the thin liquidity in the event of poor collection experience during the

postpetition period.

28.     Absent approval of the relief sought herein, the Debtor faces a substantial risk of

irreparable damage to the value of its assets and the probability of conversion of the bankruptcy

case to a case under chapter 7 without the ability to sell its assets in an orderly manner for the

benefit of the Debtor's creditors.  See In re Sun Healthcare Group, Inc., 245 B.R. 779, 781

(Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to

"permit the Debtors to continue to operate to preserve their estates").  Accordingly, the Debtor

needs sufficient liquidity to avoid a forced liquidation of its assets on a "fire-sale" basis to the

detriment of all creditors.

**The Terms of the DIP Agreement are Fair and Reasonable**

29.     In considering whether the terms of post-petition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances and disparate

bargaining power of both the debtor and the potential lender.  In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

30.    The terms of the DIP Facility are fair and reasonable under the circumstances, particularly given the current economic and lending environment, and were negotiated in good faith and at arms-length.  As discussed above, the Debtor made efforts to obtain credit on the most favorable terms and none were available.

31.    Moreover, the Debtor believes that, in its business judgment, entry into the DIP Facility is in its best interests.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994), rev'd on other grounds by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").  One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the

estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

32.    Accordingly, the Debtor respectfully submits that it has satisfied the requirements of sections 364(c) of the Bankruptcy Code, that alternative credit on more favorable terms was and is unavailable to the Debtor, and requests that the Court enter the Interim Order approving the DIP Financing and DIP Facility to immediately preserve the Debtor's estate, and enter the Final Order to ensure that the Debtor's estate is maintained through the consummation of the Sale Transaction.

**B.    The Post-Petition Financing Should Be Approved Pursuant to 11 U.S.C. §364(d)**

33.    Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d)(1).

34.    A debtor satisfies the first prong of section 364(d)(1) by demonstrating that (1) it was unable to procure financing on an unsecured basis; (2) it was unable to procure financing on a junior basis to existing liens; and (3) there is no other unencumbered property in the estate on which a debtor can grant a lien. See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Although a debtor must seek to obtain credit without priming a senior lien, debtors are not required to seek alternate financing from every source possible. Id. at 630-31. Rather, a debtor need only demonstrate that it undertook sufficient efforts to obtain financing without the need to grant a senior lien. Id. at 631 (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return

for a senior secured position"); <u>In re YL West 87th Holdings I LLC</u>, 423 B.R. 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable effort" to obtain alternative credit with lesser security); <u>see also</u> <u>In re Snowshoe Co.</u>, 789 F.2d at 1085 (4th Circuit 1986) (unsuccessful contact with other financial institutions in the geographic area was sufficient to demonstrate that credit was unavailable absent senior lien).

35.     As described above, the Debtor is unable, in the present circumstances, to meet its liquidity needs by obtaining financing on an unsecured basis.  No lender was interested in financing a junior lien on the Debtor's assets and the Debtor does not have any other unencumbered property on which to grant a first priority lien.

36.     The Debtor can satisfy the second prong of section 364(d) because the Debtor is providing the Prepetition Lender with adequate protection in the form of monthly interest payments and replacement liens on postpetition property, including new accounts receivable and Chapter 5 Claims (subject to entry of a Final Order) (the "<u>Adequate Protection</u>").

37.     Accordingly, because the Debtor satisfies the statutory requirements, the post-petition financing should be approved pursuant to section 364(d)(1).

## <u>AUTHORITY FOR USE OF CASH COLLATERAL</u>

38.     Pursuant to court order, a debtor in possession may be authorized to use cash collateral in the ordinary course of its business operations under Bankruptcy Code § 363(c).  The provision provides, in pertinent part, that the trustee may not use, sell, or lease cash collateral . . . unless–

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

39.    Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

40.    Permissible forms of adequate protection include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361.

41.    Courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. See In re Realty Southwest Assoc., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); 3 Collier on Bankruptcy 363.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); see also In re Dynaco, 162 B.R. 389, 396 (Bankr. D. N.H. 1993); In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982).  Bankruptcy Rule 4001(b) governs authorization for utilizing cash collateral and provides that the court may permit the debtor-in-possession to use cash collateral prior to a final hearing to the extent necessary to avoid immediate and irreparable harm.  After a final hearing the court may grant the authority to use cash collateral on a permanent basis and other permanent relief requested herein.

42.    Adequate protection is provided to protect a secured creditor from any diminution in the value of its interest in the particular collateral during the period of use.  See In re 354 E. 66th St. Realty Corp., 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("The purpose or intent of granting adequate protection payments are to maintain the status quo for that creditor and to protect the creditor from diminution or loss of the value of its collateral during the ongoing Chapter 11 case."); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992);

18

*Beker Indus. Corp.*, 58 B.R. at 736; In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

43.     Courts determine the means for providing adequate protection on a case-by-case basis.  See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).  Adequate protection is provided to protect a secured creditor from any diminution in the value of its interest in the particular collateral during the period of use. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. at 736; In re Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

44.     Pursuant to section 363(c) of the Bankruptcy Code, the Debtor requests authorization to use Cash Collateral on an interim basis and on a final basis through April 15, 2016 day period following the Petition Date, subject to further court-approved extensions of such period (the "Specified Period") to pay those actual, necessary ordinary course operating expenses set forth in the Budget.  The use of Cash Collateral for the Specified Period will allow the Debtor to organize its financial and business affairs and develop and consummate the Sale Transaction. If the Debtor anticipates seeking an extension of time to file their plan, the Debtor may seek a further order of the Court to extend the Specified Period.

45.     In exchange for the use of Cash Collateral, the Debtor proposes to grant the Prepetition Lender the Adequate Protection in the form of replacement liens to the extent that the Debtor's use of the Cash Collateral results in a decrease of such creditors' respective interests in its respective Cash Collateral and monthly payments of interest in the amounts specified in the

Budget.  This form of Adequate Protection is appropriate because the value of all the Prepetition Lender's collateral will be preserved and maximized by the expenditure of Cash Collateral necessary to sustain the Debtor's business operations.  See In re Q-C Circuits Corp., 231 B.R. 506, 511 (E.D.N.Y. 1999) (noting that an adequate protection package may provide, among other things, for "replacement liens" or also "cash payments"); In re Cont'l Airlines, Inc., 146 B.R. 536, 539–40 (Bankr. D. Del. 1992) (secured creditor only entitled to adequate protection to the extent the collateral declined in value); In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 716 (Bankr. D. Del. 1996) (if there is no diminution in the value of the secured creditor's collateral and the debtor can operate profitably postpetition, the secured creditor is adequately protected against the use of cash collateral).

46.    The use of the Cash Collateral is essential to the Debtor's rehabilitation efforts.  The Debtor requires the ability to pay expenses to preserve the going concern value of their operations until closing of the Sale Transaction.  Authorization to utilize Cash Collateral will provide the Debtor with the liquidity necessary to operate its business and pay the various expenses associated therewith.  Without authorization to utilize the Cash Collateral, the Debtor's business operations will be severely interrupted, if not completely terminated, and serious and irreparable harm to the Debtor and its estate would occur.

47.    The Debtor has no access to cash other than the proceeds derived from business operations.

48.    In order to avoid immediate and irreparable harm, pending the Final Hearing, the Debtor respectfully asks the Court to allow the Debtor to use the Cash Collateral on an emergency basis and to make payments of necessary ordinary course expenses, as identified in the Budget.

49.    At the Final Hearing, the Debtor will seek authority from the Court to use Cash Collateral through the Specified Period for the payment of ordinary course expenses in accordance with the Budget.  If the Debtor anticipates a need to use additional Cash Collateral beyond the Specified Period, the Debtor may seek a further order of this Court.

50.    Based on the foregoing, it is respectfully submitted that this Court should authorize the Debtor's use of Cash Collateral on an emergency basis and, after a Final Hearing, for the remainder of the Specified Period.

## THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS

51.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.

52.    Stay modifications of this kind are ordinary and standard features of post-petition financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

## INTERIM APPROVAL SHOULD BE GRANTED

53.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

54.    Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited interim hearing on this motion and (i) authorize the Debtor to borrow up to $150,000 on an interim basis, pending entry of a final order, in order to (a) maintain and finance

21

the ongoing operations of the Debtor; (b) fund the administration of this bankruptcy case; and (c) avoid immediate and irreparable harm and prejudice to the Debtor's estate, business operations and all parties in interest, and (ii) schedule the Final Hearing.

55.    The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient liquidity with which to operate its business on an ongoing basis.  Absent authorization from the Court to obtain credit and use cash collateral, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed.  The availability of loans under the DIP Agreement will provide necessary assurance of the Debtor's ability to meet their near-term obligations.  Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtor's business, to the detriment of all parties in interest.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating its reorganization efforts.

## NOTICE

56.    Notice of this Motion and proposed Interim Order was given by email, facsimile or overnight delivery of a copy to (a) the Office of the United States Trustee; (b) counsel for the DIP Lender; (c) Prepetition Lender, by its counsel, and (d) the Debtor's twenty (20) largest unsecured creditors.  Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that it be authorized to serve notice of the Final Hearing upon: (a) the Office of the United States Trustee; (b) counsel for the DIP Lender; (c) counsel to the Prepetition Lender, and (d) each of the Debtor's twenty (20) largest unsecured creditors, on or before a date to be set by the Court, and upon counsel to any official committee appointed herein, within one day after the Debtor

receives notice of the appointment of such counsel.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## <u>NO PREVIOUS REQUEST</u>

57.     No previous request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of the Interim Order and following the Final Hearing, entry of a Final Order.

Dated:   New York, New York
          February 26, 2016

                              **KLESTADT WINTERS JURELLER**
                              **SOUTHARD & STEVENS, LLP**


                    By:   */s/ Sean C. Southard*
                          _____
                          Sean C. Southard
                          Maeghan J. McLoughlin
                          200 W. 41st St., 17th Floor
                          New York, New York 10036
                          Tel: (212) 972-3000
                          Fax: (212) 972-2245
                          Email: ssouthard@klestadt.com
                                  mmcloughlin@klestadt.com

                          *Proposed Counsel to the Debtor*